FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP 0 8 2009 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
ADRIAN CASTANO,
                          Plaintiff,

       - against -

COMMISSIONER MICHAEL J. ASTRUE,
Social Security Administration,

                          Defendant.
---------------------------------------------------------- X

**MEMORANDUM
DECISION AND ORDER**

08 Civ. 3917 (BMC)

**COGAN**, District Judge.

    Plaintiff challenges defendant's denial of his application for Social Security disability benefits. Plaintiff suffers from two impairments: the lasting effects of an injured back, and an affective (mental) disorder. In his motion for judgment on the pleadings, plaintiff argues that the Administrative Law Judge ignored critical medical evidence; improperly rejected treating physician reports; and failed to consider the functional limitations imposed on plaintiff by his affective disorder.

    I hold that plaintiff is correct as to the first two of his asserted points and therefore I need not reach the third. When the record is viewed as a whole, there is no substantial evidence to support the ALJ's conclusion, and the overwhelming weight of the evidence compels a conclusion of disability. As the record is complete and defendant has not shown good cause for a remand for further hearings as to disability, plaintiff's motion is granted, and the case is remanded solely for the calculation of benefits.

## BACKGROUND

At the time of the hearing before the ALJ on June 25, 2007, plaintiff was 27 years old, with a B.S. degree from the College of Aeronautics. He had been severely injured two years before, on March 23, 2005, when, while working as a helicopter repair mechanic for a private contractor at Fort Drum, a helicopter door swung open. Plaintiff was working on the floor cleaning hydraulic fluid; the door struck him in the back, fracturing his L5 vertebra. After the injury and during the course of his treatment over the next 34 months, plaintiff's subjective complaints of pain in his back were consistently communicated to all of the doctors who examined him. At various times, he used a cane for ambulation. The reports indicate for the most part that as time went on after his injury, the pain got worse.

All of plaintiff's back problems, and very possibly his mental problems, stem from this accident. Although plaintiff attempted chiropractic treatment for two years, the record indicates that his doctors were considering surgical intervention from the first time that he saw an M.D. He ultimately had major surgery, inserting pedicle screws into his spine and fusing his vertebra, in January 2008, a fact that the ALJ appears not to have considered. A summary of the medical findings leading up to that surgery is set forth below.

## A. Plaintiff's Treating Physicians[1]

### 1. Dr. Bonnie Glassman (Chiropractor)

After receiving unsatisfactory treatment for his fractured vertebra locally, plaintiff was treated in New York City starting about three months after the accident, first by seeing a chiropractor, Dr. Bonnie Glassman. By that time (June 15, 2005), his weight had increased from 160 to 190 lbs. Dr. Glassman found that he moved with great difficulty. The range of motion in his lower back was half of the normal range. She diagnosed a number of lumbar and sacral conditions, and put him on an eight week course of intensive physical therapy. Her diagnosis was supported not only by her examination, but by x-rays. She extended his treatment program and saw him at least once more, in August 2005.

Throughout her treatment of plaintiff, Dr. Glassman, based on her examinations, the x-rays, and plaintiff's reporting, expressed the view that plaintiff had severe limitations on his ability to sit, stand or lift. In the June and August examinations, she found his ability to sit or stand limited to 30 minutes. In September 2005, she filled out a Physical Assessment Report for the New York State Office of Temporary and Disability Assistance. In that report, she found a little improvement, that he could sit or stand for two hours, and stated that she expected this condition to last 6-8 months.

---

[1] In addition to the treating physicians discussed below, plaintiff also received treatment from Bella Sandler, M.D., an internist, and she referred him for consultation to Vladimir Zlatnick, M.D., a neurologist, and Laxmidhar Diwan, M.D., an orthopedic surgeon. Their evaluations are not being discussed aside from this footnote because Dr. Sandler's evaluation was general in nature; Dr. Zlatnick found no nerve damage, which was not plaintiff's problem; and Dr. Diwan had not reviewed plaintiff's MRI or CT scan, although he did conclude from his consultation that plaintiff was "totally disabled." It suffices to note that plaintiff's subjective complaints about his pain were consistently related to all of his treating and consultative physicians.

## 2. Seaport Orthopedic Associates

Plaintiff received treatment from two doctors in this medical group, Dr. Jeffrey Goldstein and Dr. Douglas C. Schottenstein, both of whom are board certified orthopedic surgeons, starting in December 2005. After reviewing x-ray and MRI films, Dr. Goldstein found spina bifida occulta and a disc bulge at L4-5. Spina bifida occulta refers to a small opening in the vertebra that would normally be closed to protect the nerves from exposure that could result in pain. Dr. Goldstein also ordered a CT scan, as he was concerned about the possibility of spondylolysis. Spondylolysis is a defect sometimes resulting from a healed fracture to a part of a vertebra, usually the L5 vertebra, called the pars interarticularis, which can result in pain of varying intensity. The following two illustrations show, first, the position of the pars interarticularis and, second, the presence of spondylolysis:



After reviewing the CT Scan, Dr. Schottenstein concluded that in fact plaintiff had spondylolysis. The pars was also enlarged (hypertrophic) and hardened (sclerotic), which could

also cause or contribute to pain. The CAT scan also confirmed the spina bifida occulta. To put it in layperson's terms, the MRI was consistent with injuries resulting from an impact to his lower spine which had in part healed, but which had left lasting manifestations.

Dr. Schottenstein completed a functional assessment form prior to the hearing of this matter, although the precise date of his assessment is not clear except that it occurred after April 2006. He concluded, with reference to the MRI and CT scan, that plaintiff could stand and/or walk less than two hours per eight hour work day; sit less than four hours; and could lift and/or carry less than 10 pounds.

After the hearing, but about a month before release of the ALJ's decision, Dr. Goldstein surgically repaired the L5 fracture by inserting pedicle screws in it and fusing the pars interartcularis. He also cut away the arches on the L5 disc, grafting the bone so that it would hold the pedicle screws. The ALJ was provided with these records several days prior to the issuance of his decision.

In the months leading up to the surgery, Dr. Goldstein had repeatedly advised plaintiff of the pros and cons of the procedure. He communicated to plaintiff that even with the pars repair that he ultimately performed, plaintiff might still suffer from significant pain: "The patient understands that I believe he is at significant risk for continued symptomatology even following surgery for his spondylolysis at L5." Plaintiff nevertheless elected to have the surgery.

### 3. Downtown Physical and Rehabilitation Medicine, P.C. (physiatry)

Dr. Goldberg referred plaintiff to this medical group ("DPRM"), where he was treated by two physicians, Dr. Michael J. Neely and Dr. Andrew Brown. Both of these doctors are board certified physiatrists. Their review of the CT scan also confirmed spondylolysis. They

5

considered, and for the most part prescribed, a broad range of escalating treatments, ranging from over-the-counter analgesics, to pain medication patches, to spinal injections (administered by Dr. Schottenstein),[2] and ultimately the surgery which plaintiff received from Seaport Orthopedic.

About three weeks prior to the hearing, Dr. Brown completed a functional assessment form. Based on DPRM's evaluations over two years of treating plaintiff, Dr. Brown concluded that plaintiff could stand and/or walk less than an hour during an eight hour workday; that he could sit less than two hours (the lowest available choice on the form supplied); and that he could lift and/or carry less than five pounds (again, the minimum). By answer to specific questions that need not be detailed here, and citing the CT scan as evidence, Dr. Brown made his view clear that someone with plaintiff's infirmities was totally unable to work.

### 4. Holliswood Hospital (Psychiatric)

About three months prior to his hearing before the ALJ, plaintiff had what laypersons might describe as a nervous breakdown or a disassociate episode. He was taken to the psychiatric unit at Holliswood Hospital and diagnosed with manic bipolar disorder with psychotic features. Aside from being irritable, paranoid and agitated, plaintiff would engage in loud singing. Holliswood held him for nearly two weeks, discharging him when he agreed to seek outpatient psychiatric care, but the record does not indicate that he sought such care. At the time of his admission to Holliswood, testing showed "[s]ome impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment thinking or mood;" upon discharge, he received an improved score indicating

---

[2] The record shows that the spinal injections brought plaintiff some relief for a time according to the doctors who administered it. But it was apparently insufficient as both he and his doctors determined to proceed with surgical intervention. Indeed, the orthopedic surgeon to whom the Worker's Compensation Board referred plaintiff (see infra), found that the injections were ineffective.

6

"[m]oderate symptoms or any moderate difficulty in social occupational or school functioning." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32.

**B. Worker's Compensation Evaluations**

The Workers' Compensation Board had plaintiff see two chiropractors and one orthopedic surgeon.

It appears that the chiropractors, like Dr. Glassman, based their evaluations on plaintiff's subjective descriptive of his pain, range of motion testing, and his x-rays. Plaintiff's response to the motion testing was described as mild to markedly painful. One of the chiropractors, Dr. John Keenan, opined as of August 30, 2005, that plaintiff could return to work on a light duty basis. This conclusion seems strange, however, considering that Dr. Keenan also concluded that plaintiff could not stand or sit over 30 minutes at a time; that he could not bend, squat, twist, push or pull; and that he could not lift more than 10 lbs.

The orthopedist, Dr. Stanley Ross, examined plaintiff twice. His 2006 examination resulted in a recommendation that plaintiff continue chiropractic and physical therapy. By 2007, however, he recommended stopping physical therapy, as it was only a "palliative," and he concurred with Dr. Goldstein that plaintiff needed back surgery for his pain. Notably, his 2006 examination was without the benefit of any of plaintiff's medical records and testing, while Dr. Ross did evaluate those records in connection with plaintiff's 2007 examination. In addition, by the time plaintiff saw Dr. Ross in 2007, plaintiff was or had been on a significant amount of pain and depression medication – Abilify; Topamax; Arthrotec; Hydrocodone; Requip; and Lidocaine.

### C. State Consultative Physicians

#### 1. Mental Health Professionals

Although it does not appear that plaintiff had any treatment for his mental impairments aside from his hospitalization described above, the administration did arrange consultations for him with two mental health professionals.

The first, Dr. Lauree Mitchell, Ph.D., a psychologist, diagnosed him as having a "major depressive disorder" and a "generalized anxiety disorder." She said that the results of her examination were "consistent with psychiatric problems and this may significantly interfere with claimant's ability to function on a daily basis." She listed his conditions as "[g]uarded, given the severity of his symptoms," and recommended that he begin mental therapy "to address his symptoms of depression and anxiety which have been going on for at least a year [i.e., since December 2004] and have not been addressed."

A few weeks later, a state consultative psychiatrist, Dr. Anne Stockton, gave plaintiff a less negative evaluation. She diagnosed him as having a "Depressive Disorder NOS" (not otherwise specified), but concluded that he "would be able to sustain attention and concentration, interact appropriately with coworkers and supervisors, and adapt to change in the work environment," although she found him moderately impaired in some of these categories.

#### 2. Orthopedic Evaluation

By the time plaintiff saw state consultative expert orthopedist Dr. Mohammed Iqbal, in November, 2005, his weight was up from 160 lbs to 210 lbs. (still less than the 240 lbs. he would later reach). As of November 2005, Dr. Iqbal found no limitation in sitting or standing and mild to moderate limitation with lifting "mild" weights. He recommended follow up x-rays (note that

this was before plaintiff had his MRI and CT scan) as a result of the presence of spina bifida occulta, which Dr. Iqbal, like plaintiff's treating physicians, saw on the then-current x-rays.

### 3. Disability Analyst

At the time plaintiff's case was analyzed by the State Division's caseworker, Stan Metzger (November 2005), he apparently only had before him the reports of Dr. Glassman and Dr. Iqbal. He rejected the former on the ground she was a chiropractor and thus her opinion did not have controlling weight. He wrote that "[h]er opinion is not legally valid," and that "[n]o physician is even [sic; probably should be "given"] greater medical weight" than Dr. Iqbal. Mr. Metzger concluded that plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and stand and/or walk and sit for about six hours in an eight hour day.

## THE ALJ'S DECISION

Applying the familiar five-step process described below, the ALJ found that plaintiff had "severe" impairments of a discogenic and degenerative back disorder and an affective disorder, but that these impairments did not meet the requirements of the Social Security Administration's Listing of Impairments. 20 C.F.R. Part 404, Pubpart P, Appendix 1. Although the ALJ found plaintiff incapable of performing his past work, he also found that plaintiff had the residual functional capacity to perform "light work," which, the ALJ noted, also supported the conclusion that he could perform sedentary work. The ALJ cited Dr. Keenan's finding to that effect, and Dr. Iqbal's consultative evaluation. He found plaintiff's subjective complaints of pain "not entirely credible." He rejected the evaluations of plaintiff's treating physicians because they were "based on subjective complaints and not clinical findings consistent with laboratory and diagnostic tests" and because their reports were "not accompanied by a longitudinal history of

9

treatment and supporting diagnostic and clinical findings." As a result, he found that plaintiff was not disabled.

## DISCUSSION

### I. The Legal Framework

Disability benefits are available to anyone who is deemed "disabled" as that term is defined in 42 U.S.C. §§ 423(d) and 1382c (2006). A person is "disabled" when:

> he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A). A "physical or mental impairment" consists of "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic technique." Id. at § 1382c(a)(3)(D).

The Commissioner determines whether a claimant meets the statutory definition of "disabled" in five, successive steps. See 20 C.F.R. § 416.920 (2006); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). These steps may be summarized as follows:

(1) Is the claimant gainfully employed? If he is, then he is not disabled. If he is not, then the analysis proceeds to the second step.

(2) Does the claimant have a "severe" impairment(s) -- i.e., one that significantly limits his physical or mental ability to do basic work activities? If he does not, then he is not disabled. If he does, then the analysis proceeds to the third step.

(3) Does the claimant's impairment(s) meet or equal a "listed impairment"? If it does not, then the analysis proceeds to the fourth step. If it does, then he is disabled.

(4) Does the claimant's impairment(s) prevent him from doing his "past relevant work"? If it does not, then he is not disabled. If it does, then the analysis proceeds to the fifth and final step.

(5) Does the claimant's impairment(s), considered in conjunction with his residual functional capacity, age, education, and past work experience, prevent him from engaging in other substantial gainful work reasonably available in the national economy? If it does not, then he is not disabled. If it does, then he is disabled.

Id. To determine the answers to steps 4 and 5 of this process, the Administrative Law Judge must consider the claimant's "residual functional capacity," which is defined as "[t]he most an individual can still do despite their physical and/or mental limitations that affect what they can do in a work setting." 20 C.F.R. §§ 404.1545. In other words, once the ALJ analyzes how much plaintiff can do despite his impairments, he compares that ability to the requirements of his past job (step 4); if plaintiff cannot do his past job, the ALJ then considers whether there are other jobs that plaintiff can do despite his impairment (step 5). Thus, one can only be deemed "disabled" at the third and fifth steps of the determination, whereas one can be deemed "not disabled" at every step except the third one.

"The burden of proving disability is on the claimant." Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984). "[O]nce the claimant has established a prima facie case that his impairment prevents his return to his prior employment [step four], it then becomes incumbent on the [Commissioner] to show that there exists alternative substantial gainful work in the national economy which the claimant could perform, considering his physical capability, age, education, experience and training." Id.

In weighing the medical opinion evidence, the ALJ is obligated to adhere to the rules set forth in 20 C.F.R. § 416.927(d) (2006). These rules indicate that, generally, more weight is given to the following: (1) opinions provided by physicians who have actually examined a

claimant; (2) opinions provided by a claimant's treating physicians; (3) opinions supported by objective relevant evidence; (4) opinions that are more consistent with the record evidence as a whole; (5) opinions of specialists about medical impairments related to their area of expertise; and (6) opinions that may be supported by any other factors the claimant brings to the Commissioner's attention. Id. However, the Commissioner must give a treating physician's opinion "controlling weight" if his or her opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." Id. at § 416.927(d)(2). This is known as the "treating physician rule."

## II.  Scope of Review

Judicial review of disability benefit determinations is governed by 42 U.S.C. §§ 421(d) and 1383(c)(3) (2006), which expressly incorporates the standards established by 42 U.S.C. § 405(g) (2006). In relevant part, § 405(g) adopts the familiar administrative law review standard of "substantial evidence," i.e., that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" Thus, if the Commissioner's decision is supported by "substantial evidence" and there are no other legal or procedural deficiencies, then his decision must be affirmed. The Supreme Court has defined "substantial evidence" to connote "more than a mere scintilla[;] [i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence supports a finding of the Secretary, the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such finding, including any contradictory evidence and evidence from which

conflicting inferences may be drawn." Rivera v. Sullivan, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).

**III. Analysis**

I cannot find satisfaction of the substantial evidence standard on this record. The analytical errors break down into two groups. First, the ALJ improperly discounted the testing and evaluations of board certified physicians who treated plaintiff for over two years, choosing instead, in essence, to favor a state consultative physician opinion based on what is generally a one hour or less examination. (Although the record does not indicate how long Dr. Iqbal's examination took, there is nothing to indicate it went beyond the standard consultative examination.) Second, in looking at the evaluations of plaintiff's treating physicians individually, the ALJ selected only those portions of each evaluation that might support a finding of non-disability, while disregarding the much more substantial portions of their treating records that supported a finding a disability.

The most blatant error was the decision to disregard the treating physician evaluations on the ground that they were based on "subjective complaints" rather than "laboratory and diagnostic tests." This is simply not true. I am not sure what tests the ALJ would have liked to have seen to back up those subjective complaints. All the physicians, including the chiropractors, who looked at plaintiff's x-rays, MRI, and CT scan agreed that they showed spina bifida occulta, bulging discs, and spondylolysis, precisely in the area where plaintiff fractured his back. Each one of those conditions can cause the symptomology of which plaintiff was complaining. These imaging techniques that his physicians used are *the* means used to look for a basis for subjective complaints of pain in the back – indeed, the decision to subject plaintiff to

major back surgery was made on the basis of these tests as well as plaintiff's complaints of pain – and neither Dr. Iqbal nor anyone else suggested that there were any other tests that should be undertaken to confirm or refute plaintiff's complaints.

Although I recognize that the severity of back injuries can be difficult to quantify and easy to exaggerate, plaintiff's complaints have to be evaluated against one indisputable fact: he was slammed in the back by a heavy aircraft door that fractured his vertebra. When that fact is combined with plaintiff's subjective complaints of pain, clinical testing that shows the lasting effects of that impact, manifested by objectively recognized medical diagnoses that are consistent with those complaints, a lengthy period of diagnosis and treatment by board certified orthopedists and physiatrists who believed that they found an objective basis for plaintiff's subjective complaints, and a decision, based on those evaluations, to proceed with major back surgery, I cannot see any basis for discounting the treating physicians' opinions.

The ALJ's rejection of the treating physicians' evaluations in favor of that of Dr. Iqbal is particularly troubling for several reasons. First, it was Dr. Iqbal, not the treating physicians, who based his analysis on an incomplete testing record. At the time of Dr. Iqbal's examination in November, 2005, plaintiff had not yet had his CT scan. Yet plaintiff's treating physicians had prescribed a CT scan specifically because they suspected spondylolysis, and the test proved them right. When plaintiff's treating physicians filled out their assessment reports, they knew about the CT scan showing spondylolysis and specifically cited to it. Dr. Iqbal did not have a CT scan, did not request it, and thus could not consider its significance.

Second, in relying on Dr. Iqbal's assessment, the ALJ, and indeed defendant's brief in this action, rely on an often-used but dubious argumentative technique of selecting the facts that

tend against a finding of disability, however attenuated, while ignoring the key test results that are consistent with a finding of disability. The technique appears to be that by showing the absence of a large number of diagnoses and plaintiff's engagement in a large number of activities that might support a finding of nondisability, the threshold of "substantial evidence" can be met. But I am not sure it matters all that much that a claimant can dress himself, cook, clean, do some laundry and shower – or that he can "watch television" or "listen to the radio" – when his imaging studies show serious structural damage to his back. It is not irrelevant, but it is not highly probative when compared to other evidence. Similarly, it does not matter that plaintiff is not suffering from stenosis or spondylolesthesis, as the ALJ duly noted the medical records indicate,[3] any more than the fact that he has normal reflexes, which the medical records also reflect. I suppose these facts show that plaintiff is not bedridden or in agony, and thus provide some circumstantial evidence of ability to work, but disability obviously can be present notwithstanding the ability to do these tasks and in the absence of irrelevant diagnoses. All that really matters here is that plaintiff has clinical testing showing a fractured vertebra, spondylolysis, spina bifida occula, and bulging discs, and he is complaining of back pain severe enough to prevent him working. The question is whether those complaints are credible.

The ALJ's invocation of the boilerplate phrase "not entirely credible" to reject plaintiff's complaints is, frankly, not entirely credible. Plaintiff most definitely has mental issues (which may have resulted from his injuries, although the record does not disclose this), but there is nothing inconsistent about his complaints and his medical tests.

---

[3] Spinal stenosis is a narrowing of the spinal canal that can cause pain by compressing the nerves. Spondylolesthesis, which must be distinguished from spondylolysis, is when one vertebra improperly slips over another, which can also cause pain. Plaintiff's treating physicians noted that he did not have these conditions, but neither is why they operated on him. They operated on him to repair his pars interarticularis because he had a fractured L5 vertebra and spondylolysis.

15

In this regard, it is curious that the ALJ discounted plaintiff's treating physicians based on an alleged lack of clinical testing, of which there was in fact plenty, in favor of Dr. Iqbal's findings, which were primarily based on subjective reporting of pain upon loading and similar manual manipulations. It seems that when plaintiff resisted reporting pain, he was found credible, but when he made such reports, he was found "not entirely credible." A far more likely reconciliation is that for the comparatively brief appointment with Dr. Iqbal, his pain may have been more tolerable, but his two years of treatment with his own orthopedists and physiatrists, and most importantly their conclusions about his credibility, are far more telling in evaluating plaintiff's credibility. Certainly, if plaintiff was prone to exaggerating his pain or being oversensitive to it, there is no reason why he would have grit his teeth more during Dr. Iqbal's examination than during that of his own doctors' evaluations.

Another indicator of plaintiff's credibility not mentioned by the ALJ and yet highly probative is the fact that plaintiff decided to have major surgery on his back despite repeated warnings from his doctors that it might not lessen the pain. Absent some Munchhausen-like syndrome, there is simply no reason why a person would subject himself to this kind of surgery unless the pain in the absence of surgery was too severe to live with. His decision to go forward with the surgery despite a guarded prognosis is a far more probative indicator of the credibility of plaintiff's complaints than his ability to cook.[4]

---

[4] There are two notable aspects of plaintiff's testimony before the ALJ. The first is the unusual degree of hostility between the ALJ and plaintiff's then-counsel over the latter's failure to compile the appropriate medical record. It is clear that plaintiff's counsel did not perform as he should have in this regard, so that the ALJ's umbrage was not wholly unjustified, but it was very apparent. Second, the ALJ was very obviously concerned with the fact that plaintiff had collected both unemployment benefits and worker's compensation benefits, which he termed "fraudulent," a characterization with which plaintiff's attorney agreed. Plaintiff, however, was steadfast in denying knowledge that there was anything wrong with collecting from both benefit programs. These two factors led to testiness in the ALJ's examination of plaintiff that is very apparent from the transcript.

16

Defendant asserts that the ALJ did not have to take into account the significance of plaintiff's back surgery because, although the ALJ kept the record open for two weeks after the hearing to receive additional evidence, the report of plaintiff's operation was not received until two days before the decision was issued – six months after the hearing. I have to agree with plaintiff that this argument misperceives both the record and the very purpose of the process to determine disability. First of all, although plaintiff had repeatedly discussed the need for surgery with his physicians – and the ALJ knew at the time of the hearing that he was going to have the surgery in the near future – the surgery was not performed until six months after the hearing. He thus could not have included the operative report in the record within two weeks of the hearing. In addition, at the time he submitted the report, one month after the surgery, he had no way of knowing that the ALJ's decision would be issued two days later as opposed to, for example, another six months later. Moreover, the report of the operation apparently was received in time to be considered, as it was marked and included as part of the record.

More fundamentally, the procedure before the Social Security Administration is not supposed to be adversarial, but, rather, inquisitorial. See Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009). It is not a game of "gotcha." The goal is not for the Commissioner to "win" a finding of nondisability, but to fairly determine if a claimant is disabled. See Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004). If, for some reason, the ALJ was unable to delay issuance of his decision until he could consider the surgical report that was by then part of the record, then surely the Appeals Council should have realized that something was amiss in the ALJ's rejection of a claim that had resulted in major spinal surgery just before his decision, a surgery that was performed in a manner fully consistent with plaintiff's expressed expectation at the hearing.

Another anomaly in the ALJ's analysis was his treatment of the report of the disability analyst, Mr. Metzger. It will be recalled that Mr. Metzger had rejected the findings of Dr. Glassman over Dr. Iqbal on the ground that the former was a chiropractor. The ALJ, however, cited to a portion of Dr. Glassman's August 2005 report, which supposedly stated that plaintiff could return to light duty work. Defendant concedes that this reference was a mistake; the ALJ's reference should have been to Dr. Keenan's report, which did state that plaintiff could return to light duty. However, it is curious that in this instance, the view of a chiropractor was accepted, contrary to the approach of Mr. Metzger, whose denial of the application had led to the hearing in the first place, and the ALJ's view of the weight to be afforded Dr. Glassman's evaluation. Moreover, if any health professional's evaluation was not supported by clinical testing or internally contradictory, it was Dr. Keenan's, for he, in the same report, found that plaintiff could not stand or sit over 30 minutes at a time; that he could not bend, squat, twist, push or pull; and that he could not lift more than 10 lbs. I do not see what kind of light work a person can do if he cannot sit or stand over 30 minutes at a time because the pain becomes too severe. Thus, the impression is left that the ALJ accepted one portion of a chiropractic evaluation which weighed in favor of a finding of nondisability, but rejected the overwhelming weight of chiropractic evidence which suggested or found disability.

The ALJ also elevated Mr. Metzger's profession to that of a "state agency medical consultant." That is how he referred to Mr. Metzger, and the error was fundamental to the ALJ's decision, appearing in a paragraph containing his holding:

> The undersigned, according appropriate weight to all the evidence, finds the report of the state agency medical consultant (see Exhibit 5F) [Mr. Metzger's evaluation], indicating that the claimant can perform the activities of light duty, is consistent with the other medical evidence ... ."

Treating a disability analyst as a doctor can be a fundamental error. See Dewey v. Astrue, 509 F.3d 447, 449 (8th Cir. 2008).[5] Defendant on this appeal relies on cases holding that the same error can be harmless, see, e.g., Jones v. Astrue, No. 07-cv-0698, 2008 WL 1766964 (S.D. Ind. Apr. 14, 2008), and that is no doubt accurate. But there is nothing harmless about the error here. The only professional evidence in support of a finding of nondisability to which the ALJ referred is Dr. Iqbal's brief evaluation without the benefit of complete medical testing and Dr. Keenan's peculiar use of the term "light duty." Converting a nonprofessional to a physician on this record is not harmless. See Bryant v. Astrue, No. 07-cv-1865, 2009 WL 1383265 (E.D. Mo. May 14, 2009); Chitty v. Astrue, No. 07-cv-861, 2008 WL 5427597 (M.D. Ala. Dec. 30, 2008).

The misclassification of Mr. Metzger's evaluation alone would be sufficient grounds for a remand. Having reviewed this record carefully, however, and based on the discussion above, I cannot see how any finding of nondisability could stand. There is no basis for rejecting the views of plaintiff's treating physicians, and very little evidence that could support a finding of nondisability.[6] We thus do not need to make this case one of those unfortunate ones that winds its way back and forth between the agency and the courts for a period of years. No cause has been demonstrated for a remand. See Simmons, II v. U.S. R.R. Retirement Bd., 982 F.2d 49, 57 (2d Cir. 1992). The conclusion of disability on this extensive and complete record is compelled.

---

[5] In fact, the finding made in Dewey was virtually identical to the finding made here:

> In reaching this conclusion [that Dewey's testimony regarding the severity and functional consequences of his symptoms was not fully credible], substantial weight is being given to the opinions of the Disability Determination Service physicians as supported by and consistent with the evidence of the entire record (Social Security Ruling 96-6p). They determined that the claimant retains the ability to perform work at the light exertional level with some postural limitations. The undersigned agrees.

Id. at 449.

[6] Defendant refers to various other findings to support the ALJ's result, most of which the ALJ neither cited nor relied upon, such as Dr. Ross' 2006 evaluation. Dr. Ross' 2006 finding was effectively superseded by his much more negative 2007 assessment, recommending that Dr. Goldstein perform the surgery.

19

## CONCLUSION

Plaintiff's motion for judgment on the pleadings is granted, and defendant's cross-motion is denied. The Clerk shall enter a judgment remanding this case to the Commissioner solely for the calculation of benefits.

**SO ORDERED.**

s/Brian M. Cogan
U.S.D.J.

Dated: Brooklyn, New York
September 4, 2009